Well, good afternoon everyone. I'm Judge Hawkins and with me on remote are my colleagues Judge Margaret McKeown and Judge Susan Graber. We're here on O'Kell v. Burgum, 15 minutes per side. If counsel are ready. Thank you, Your Honor. May it please the Court. John Drake on behalf of the Appellant, Secretary of the Interior, Doug Burgum, I'm going to attempt to reserve about five minutes for rebuttal and I'll monitor my own time. Your Honors, this appeal, like the prior appeal, is about limiting front pay to a temporary make whole remedy. This Court's precedent is clear. Front pay is designed to bridge a temporary gap in employment from the time judgment is entered until the plaintiff obtains a comparable job. The controlling principle, which this Court recognized and applied in the prior appeal, is that front pay cannot extend beyond the time it would take the plaintiff to find a comparable job. Now, the District Court originally awarded 11 years of front pay through Ms. O'Kell's retirement and that award effectively paid Ms. O'Kell for a permanent loss of federal employment and federal benefits in amount just under a million dollars. This Court vacated the front pay award and remanded. The Court's holding on the re-employment issue was twofold. The Court ruled first that the District Court had abused its discretion by awarding front pay without considering Ms. O'Kell's ability to find a comparable federal job. And second, to the extent the Court had considered that issue and made an assumption that Ms. O'Kell would never be able to return to federal employment, that that finding was clear error because Ms. O'Kell, number one, had received two comparable federal job offers before trial, and two, because she was awarded a clean personnel file, which she had requested, which removed the only known barrier to her returning to federal employment. This Court instructed the District Court to reconsider and recalculate the front pay award, accounting for the two comparable federal job offers and clean personnel file. The directions really could not have been more clear, but the District Court doubled down. It again awarded front pay through retirement 11 years into the future, based on an assumption that Ms. O'Kell would never be able to return to federal employment in a comparable position. Did we cabin the limits that the District Court could take in reaching its determination on remand? Yes, you did, Your Honor. And I think for purposes of the relocation issue, the important point is that the Court's holding, again, was twofold. Number one, that the District Court abused its discretion by not considering Ms. O'Kell's ability to find comparable employment. I may be looking at the wrong part of the record, but my understanding is our decision told the District Court that it had no constraint to look at the record and make an appropriate determination. We didn't tell them what to do. That's correct, Your Honor. The Court did include the sentence that the Court was not required to arrive at any particular result, but that has to be understood within the context of the issues that were actually litigated and actually decided. And the second piece of the Court's holding is critical because the Court held that to the extent the District Court made a finding that Ms. O'Kell would never be able to return to employment, that finding was clear error. The Court, in making that finding, was rejecting Ms. O'Kell's argument, which she made repeatedly in her answering brief in the O'Kell 1 appeal, that the District Court had made a finding to that effect or had concluded that she would not be able to return to the federal workforce. That's at ER 331, ER 332, 336, 341, and 342. Aren't we really here on whether there's factual support for the District Court's determination on remand that O'Kell was not reasonably likely to relocate anywhere in the United States for comparable worth? Isn't that really why we're here? Well, I think you're correct, Your Honor, that the Court does need to focus on two components of the District Court's analysis. Number one, that there was no comparable job opportunities available to O'Kell, that such opportunities were, in the District Court's words, virtually nonexistent. And second, that Ms. O'Kell may not have been willing to relocate for a job. And that's really the crux of the Court's holding because the Court did consider other factors, but it gave those two factors dispositive weight. Well, my concern with what... I'll just be up your colleague on the other side will address this as well. We specifically held in the earlier disposition that the District Court abused its discretion by inferring that plaintiff is not reasonably likely to relocate and that the record did not support that inference. And without that inference, I'm not really sure I understand how the District Court arrived at what it arrived at. I agree, Your Honor. And this notion that the District Court latched onto that maybe Ms. O'Kell was not willing to relocate in the future, that there wasn't enough evidence to draw that inference is frankly quite confusing because all the evidence in the record that was before the District Court suggested that she was perfectly willing to relocate from the nationwide job search to the fact that she accepted the West Virginia job in 2019 before the offer was revoked, from the fact that she opposed the government's summary judgment motion on mitigation of damages, claiming that she was searching for comparable positions and substantially equivalent employment by applying for realty specialist positions in other states, to the position she took in her trial brief that she needed a clean employment file so that she could return to the federal government. And most... Can I just ask you, in fairness to the District Court as well as to the plaintiff here, in your view, is there any evidence in the trial record that would support a finding that the plaintiff was, at least at the time of the judgment, unwilling to move elsewhere? No, there is not, Your Honor. I think all evidence is to the contrary. The only evidence that could remotely support an idea that she was not willing to relocate is the fact that she turned down the second identical job offer in Fort Irwin, California. Well, she did have some limitations that were very clear. One was no long commutes. I think she said 15 minutes or less. And in a community where there was decent health care. So those were definitely geographic, if you will, that she expressed. And also the need for relocation costs. For example, she said she would return to Ohio, but it was too expensive to do that. So those limitations clearly were stated. But what I'm trying to find out is if I'm missing something in the record that there were any other geographic limitations. No, there were not, Your Honor. And I'd call your attention to the concluding piece of Ms. O'Kell's testimony about that Fort Irwin job, because she said that, yes, that particular job in that particular location was not a fit for her. But she said at the very end, there are a lot of other jobs in the world that you don't have to drive that far for. And that was a very clear expression of her willingness to continue searching for comparable jobs outside of Grant County. Here's what the district court actually said. The court can infer from the evidence that plaintiff has shown a willingness to relocate in the past. However, at trial, there was no testimony as to whether plaintiff then or at some time in the future could relocate, wanted to relocate, or would consider relocating, and if so, under what conditions. And then there's a couple of skips there. Given all the evidence, the court concludes there was insufficient basis to reasonably infer the plaintiff was reasonably likely to relocate anywhere in the country in the future. That is what the court said. It, that is precisely what the court said. However, the court overlooked the alternative to damages scenario, the return to federal employment damages scenario. I mean, that scenario includes, as we said in our briefing, a request for $32,000 in relocation expenses. It includes a $45,000 or $47,000 offset for state income tax liability, which the state of Washington does not have, but other jurisdictions do have, and a $250,000 offset for increased costs of living. Well, that brings me to two questions. Let me first, one relates to the relocation costs, and then the other relates to the operative date. On the relocation costs, if, as we maintained before, the district court erred in finding her able to relocate, does the issue of relocation costs remain on the table? And would that be on a remand? Where does that come in? Well, Your Honor, I think relocation costs are only on the table if Ms. O'Kell is in fact willing to relocate, because if Ms. O'Kell went to trial knowing that she would never have relocated outside of Grant County, she wouldn't have offered that alternative to Of course, you can't recover damages for an expense that you're not actually going to incur. So it makes no sense, frankly, for the relocation costs to be included in the request for relief, and then for Ms. O'Kell to say, well, actually, I needed to stay in Grant County. And another question is, there's a lot of dates involved here, at which point you peg the testimony. She was deposed in December 2019. Then there was the bench trial, November 21 and February 22. And then, of course, she got the clean record file in January 2023. Which of those is the operative date for determining the ability to relocate? I think the operative date, Your Honor, is the time of trial, because that's the demarcation point between a back pay award and a front pay award. Back pay is for damages incurred prior to trial. Front pay is for looking relief for, again, that temporary period that it would take the plaintiff to find a comparable job. And so that needs to be the focus. And unless there are any further questions, I'll save the balance of my time for rebuttal. Thank you, counsel. We'll now hear from Mr. Crotty. Yes, Your Honor. May it please the Court, I'm Matt Crotty. I represent Kelly O'Kell. The government's appeal is based off the false presence, false assumption, statement that Ms. O'Kell changed her position after trial as it relates to the issue of relocation. As early as Ms. O'Kell's December 2019 deposition, there was testimony from her in the context of moving from Grant County, Washington to Ohio, that she was not able to move in that regard. Because of the cost, she said she couldn't afford it. And she also specifically testified in the deposition that she had interviewed, quote, all over. And one of those interviews had been in Utah. I just don't see that there's any testimony in the or elsewhere that specifically said, I'm not willing to relocate. So that's the deposition testimony. But then if we go to it again, this is the defendant's position is that they've been ambushed and there was this bait and switch. So now I'm going to direct the court to trial exhibit 202. That's ER 636. That would be the plaintiff expert witness report that was supplemented between the November 2021 first week of the trial and then the February 22 second week of the trial. And in February 2022, that is when the both sides economic loss experts testified. So this is the expert report and not testimony from your client, correct? That's what I'm looking at in 636. Okay. But again, it's the defendant's position that there's been some ambush about the missile kill was relocation. So here are expert report consistent with his first expert report back in 2019 set out and it's on the first page, the Grant County mitigation scenario, alternative one. And so that's the first page, no relocate the second page for four door one. That is the relocate scenario. And as it relates to the no relocate Grant County scenario, our expert assumes a $57,000 per year mitigated earnings going forward. So when defense says that this is some windfall for front pay for 11 years, that's incorrect because our expert assumes that missile kill by saying in Grant County would have obtained employment that pays $57,000 per year. Counsel, my question to you is how can an expert report whatever it says, supply the underlying testimony or evidence of your client's state of mind when what she testified to was the things that I mentioned earlier. She said, I can't drive more than 15 minutes to work. I need to be near in a place where there's good medical care. I can't climb a lot of stairs. She had many limitations. Not one of them in her testimony was I won't move. I just don't understand how the expert gets you there. Well, again, we're looking partly at the expert report, but then also what the entire record that the court considered a trial and what missile Cal testified to on direct during the November phase of the trial was that she, as it relates to the Fort Irwin job, was not able to take it for the reasons that you discussed and then keeping the clear error standard in mind. And that's what the district court is applying to is held to here. It's significantly deferential and a quote from the Cree versus Flores case, one 57 fed third, seven 62, where there are two permissible views of the evidence, the fact finders choice between them cannot be clearly erroneous. So here the district court took missile kills testimony at trial as of November of 2021, that significant health issues prevented her ability to move with the expert testimony that was introduced in February of 2022 and led in with that permissible view of the evidence concluded that there was no, there was a lack of testimony about missile kills ability to relocate in the future. Therefore, the court chose alternative one, which the defense was able to contest with its own expert. They had their own mitigated earnings. They're they're experts. There were two of them were able to talk to somebody with the state department of employment security division about the length of time for unemployment in Grant County, Washington. And so again, keeping what one of the things that I had a question about also was, as I understand it in the alternative, you're asking for a new trial on damages or the government is asking for a new trial on damages. One of you is, uh, if there were such a thing, what would the issues possibly be? So just to be clear, your honor, the, the, no, I should direct this to, uh, to your colleague, Mr. Drake, but, but to, to the court's point, I mean, there is, there's no grounds for that. There's no manifest error of law. There's no error of fact, there's no newly discovered evidence. And yes, I mean, a, in the event, the court were to grant a new trial, it's probably going to be Ms. O'Kell saying I cannot move now, um, for whatever. Why would, why would that be relevant? Because the issue is whether there was a mistake at the time of judgment, not whether things are different now. Right. I mean, that's, I agree. I mean, no need for new, new, new trial, but back to the point. I thought that the, there was, uh, testimony with respect to a new trial saying it's a closed record, no additional testimony that relates to a potential request by the government for a new trial. But the state we're in is that the record is fixed. Do you agree with that? Yes, your honor. Okay. So I have one last question that I would like both of you to respond to, and that is whether, uh, your respective clients would be amenable to mediation. Your honor, we've tried to mediate this case and correct me if I'm wrong, Mr. Drake, I believe three times, and I believe we're at a point where there needs to be a decision that ends this once and for all. Thank you. As it relates to though, keeping clear error in mind, the, uh, again, significantly deferential, if there's two permissible views of the evidence, there's also, again, with clear error in mind, there is no case law that the government pointed to that says if you at some point apply outside of your commuting distance, you are forever limited in getting front pay. There's no nice circuit case on that point. There's no nice circuit case on the point that if you request a clean personnel file and front pay, then your ability to get front pay is curtailed. There's nothing on that. There's no nice circuit case that says if at one point when you were fired and then get an offer six months later, that your front pay years down the road is cabined at this six month period. No, that's true, but doesn't it have to do with what is a reasonable amount of front pay? If someone gets an offer, doesn't that indicate that they reasonably could be expected to get an offer? Well, then, again, keeping clear error in mind, and in this circuit's precedence, you have the, uh, the nice circuit case the district court looked at in arriving to its findings of amended findings of fact, and that's the Gotthard versus National Railroad passenger passenger corporation case, which this was a constructive discharge case awarded 11 years and upheld it on appeal of front pay, again, for constructive discharge. And the Gotthard case has 11 factors that this, uh, the district court went through, and I'm not going to name them all, but some are, you know, the mitigation efforts, which they're there, availability of other employment opportunities, but then there's also more importantly in this case, um, work life, age, and health. And as time wore on, Ms. Hochel's health got worse, as testified at the November 2021 trial when she talked about the many issues she had. And for there, given a permissible inference of the evidence and reading of it, the district court concluded within his discretion, the 11 years of front pay offset by $50,000 per year of mitigated earnings was, was reasonable. And this is also consistent with the Draxler versus Multnomah County case 596 Federal 3rd 1007 that says, quote, if plaintiff is close to retirement, front pay may be the only practical approach. Also, and the district court cited that case. And then in going through the 11 part Gotthard factor, it made the point that Ms. Hochel by the time of trial, she'd been out of work for 43 months, that clean personnel file aside, she's still going to have to go to an interview. She's going to explain why she got fired. She's going to have to explain how she sued her employer. And those are all in, you know, things that will likely result in her not being able to find work at all, especially given her, her current age. Well, with respect to the age, other than the district court statement, is there anything in the record that demonstrates that a prospective federal employer would discriminate against her based on her age? No, there's nothing in the record, because I mean, there's no testimony from other federal employers to that regard, nor is there any testimony from the defense. And the other thing to keep in mind here is that it was that it's the defense that bears the burden of proving failure to mitigate. And that includes proof that there were substantially equivalent jobs available to Ms. Hochel in this instance within her commuting distance. And there... But that suggests it's almost like a double standard. Well, does the defense have to show that age would not be a factor? That seems to me that that would push the burden of proof too far. And I'm not saying that. I'm just saying, though, that the defense does bear the burden of proving failure to mitigate. And one of the elements is substantially equivalent employment. And then keeping the theory of the defense appeal in mind that there was some unfair surprise. Again, that's just not correct, because their expert was able to consult with a vocational rehabilitation expert before he testified in February of 2022. And when I asked him on cross-examination, name one job, one job, Mr. Expert, that Ms. Hochel could have gotten in Grant County, Washington, he was not able to do so. And he said, I'd have to look at my file. What he didn't say, and this is important, is, oh, this is the first time I'm hearing that Ms. Hochel is now taking a position that she can't relocate. The fact that there were two scenarios, one involving Ms. Hochel staying in Grant County, another involving the possibility of relocation, which decreased over time as her health got worse, was the other scenario. So, going to the trial when me, representing a plaintiff, had no idea, and no one does when they go to trial, how the court would rule, we advanced two scenarios consistent with the testimony and evidence. And again, there was no prejudice to the government. They were able to meet Ms. Hochel's argument as it relates to scenario one. And specifically, if you look at ER-697, this would be defense trial exhibit 679, their expert acknowledges. However, there is little evidence Ms. Hochel actively sought work in other areas. So again, the fact that Ms. Hochel was remaining in Grant County was no surprise to the defense, and they were able to, at trial, propose a $64,000 mitigated earnings in Grant County, which is a little bit more than the $57,000 mitigated earnings that our expert proposed and which the district court held Ms. Hochel to. And then, you know, lastly, as it relates to both new trial and, you know, no prejudice to the government, it was the government's before trial that they had, that they, the court required Ms. Hochel to testify first. So, you know, the varied issues could be identified. So when I asked Ms. Hochel on direct about why she turned down the grant, or the Fort Irwin job, the defense had an opportunity. They cross-examined Ms. Hochel for three days or seven hours, and not once did they get up and ask Ms. Hochel the, the pointed questions about, okay, so are you saying you can never relocate or, you know, explain yourself Ms. Hochel. So they made a motion to have Ms. Hochel testify first. They heard what she had to say on direct examination, and they did not ask any follow-up questions. So essentially, the government is not asking this court to correct clear error. What it's asking is for another redo, and Ms. Hochel respectfully requests that this court make a final decision, uphold the 11 years of front pay, deny the government's request for a new trial, and put this eight-year saga to bed. Thank you. Thank you, counsel. Time for a rebuttal. Thank you, your honor. I'll start by addressing some of the questions that were asked of both parties. Judge Graber, you asked in the event of a new trial, what issues would be addressed. I think primarily it would be the subject of what, what is comparable employment within the universe of jobs that Ms. Hochel is willing to take. If Ms. Hochel is allowed to change her position after trial that she needs to remain in Grant County, the government would put on evidence from a vocational expert to identify what types of comparable jobs are available in and around Grant County. That's a pretty fundamental piece of the equation that's missing, only because the government relied to its detriment on Ms. Hochel's position at trial that she was willing to relocate and would do so for a comparable federal job. I'm wondering though, you had requested a new trial, but had indicated earlier it's a closed record. So now I feel like you're suggesting that there would be supplemental testimony after you, the government had said it was a closed record. What's your response to that? Your honor, it was Ms. Hochel who went first in saying that it was a closed record on her man, because that's how she interpreted this court's decision and Ms. Hochel won. And the government agreed with that position. And the government's position was that Ms. Hochel... The government agreed to it, didn't they? The government agreed that it should be a closed record. And the government's position with respect to this relocation issue is that Ms. Hochel baited and switched, and she should be held to her original position at trial that she was able to take a comparable job, that she was willing to take a comparable job, and that she would in fact take a comparable federal job if her file was cleaned. And so the government did not waive any relief by agreeing that this court directed the district court to look at a closed record and examine the issues based on the evidence that was presented at trial. But when the district court did in fact allow Ms. Hochel to engage in that bait and switch, the government said, well, look, if you're going to allow her to do that, then we need a fair opportunity to respond in kind. We, again, relied to our detriment on the position that she took up to and throughout the trial. Judge McEwen, you asked if there's any evidence in the record that a future government employer would discriminate against Ms. Hochel based on her age. There's no such evidence, and there's evidence to the contrary. She received two offers, identical offers from federal employers, and there's every reason to expect that she will receive more offers in the future if she keeps applying for those jobs. I would like to briefly address Mr. Crotty's point that the defendant bears the burden of proof on mitigation. This came up in the prior appeal. That is only true as to back pay and the affirmative defense of failure to mitigate, which is limited to the issue of back pay. When it comes to front pay, damages that are awarded from the point of trial forward, it is the plaintiff's burden to come forward and say, gosh, I am not going to be able to find another comparable job, or I think it's going to take me five years, 10 years, however long. It is not the government's or the defendant's burden of proof to essentially disprove the plaintiff's entitlement. Two quick questions. Question number one is whether we are reviewing for clear error, as Mr. Crotty said, or whether we're reviewing for abuse of discretion. Your Honor, I think it's complicated. It is abuse of discretion to the extent that we're talking about the court's general consideration of comparable employment opportunities. But again, with respect to this key finding that the district court made that she would not be able to return to comparable and federal employment, that is a finding of fact that was made. But this court said in locale one that that was clear error. That finding cannot stand on the record presented at trial, and nothing has changed since then. And my last question is whether you agree that mediation would be futile. Well, Your Honor, I am never one to turn down mediation, but Mr. Crotty is correct that the case has been mediated several times unsuccessfully, and it does seem that the parties are somewhat entrenched. But if the court wants to order us to mediation, we will of course participate in good faith. Okay. Well, thank both counsel for their excellent arguments and their briefing. And this case is now submitted to a decision. Thank you. This court for this session stands adjourned.
judges: McKEOWN, BEA, BRESS